## McGill v. Goldstein

*Cheryl B. Wolf,* for plaintiff.
*Brian A. Wall Jr.,* for defendant.

BONAVITACOLA, *S.J.,* June 20, 2005—

## INTRODUCTION

This arbitration appeal presents an apparent issue of first impression under the provisions of a recently-adopted rule of civil procedure: In an appeal from arbitration in which the plaintiff has stipulated to limit damages to $15,000, as permitted by Rule 1311.1(a), may the plaintiff introduce medical records at trial without witness authentication, as authorized by Rule 1311.1(b), over a defense objection, if the medical provider who created those records appears pursuant to a defense sub-

poena, but refuses to testify on Fifth Amendment grounds?

I overruled the objection, and allowed admission of the records of Richard J. Walinsky, a chiropractor, but instructed the jury (and allowed the defendant's counsel to argue to the jury) that it could properly consider Dr. Walinsky's refusal to testify in evaluating the weight to be given his records.[1]

I also denied defense motions to strike the report of another medical witness, David L. Mattingly D.O. (which was also admitted pursuant to Rule 1311.1), on the basis that it was premised on facts "directly contradicted" by the plaintiff's own testimony, and to enter a compulsory nonsuit against the plaintiff for lack of evidence. The defendant has taken issue with these decisions.

The defendant has also objected to payment to Dr. Walinsky of a $350 witness fee, which I determined and imposed, pursuant to Rule 1311.1(d), for his appearance, because Dr. Walinsky, when called, refused to testify, and because Dr. Walinsky was to testify as a fact witness, and not as an expert.

After carefully considering the defendant's objections, I concluded that my decisions at trial were correct, and thus denied post-trial relief. This appeal followed.

## BACKGROUND

This is otherwise a completely ordinary automobile accident case. On September 12, 2001, at approximately

---

1. A second chiropractor, Eileen Nelson Means D.C., did not appear, but the parties stipulated that, if she had been called, she would similarly have invoked the Fifth Amendment in response to any questions asked of her.

1 or 2 in the afternoon, plaintiff Horace McGill, a medallion taxicab driver, was operating his taxicab, with three passengers, westbound on Grant Avenue. As he crossed the Roosevelt Boulevard, with the traffic signal in his favor, his cab was struck on the left side by a vehicle operated by defendant Goldstein, who admitted causing the accident.

Mr. McGill testified that, after the accident, he suffered the usual assortment of aches and pains, in his left shoulder, his left hip and his mid-back, that he underwent chiropractic treatment with Richard J. Walinsky, a chiropractor, for a period of about five months, and that, at the end of that time, he considered himself fully recovered.

According to Mr. McGill, he missed only two days' work[2] as a result of the accident, but for a period of two or three months he was unable to drive his customary nine- to 10-hour schedule, five or six days a week, and instead worked only four or five hours a day, perhaps two days a week.

He also said that, during that time, he was unable to do all of his normal household chores, or to assist his mother-in-law with hers (as had been his habit), and that he was unable to play pickup basketball with his friends for a period of several months.

## DISCUSSION

Pennsylvania Rule of Civil Procedure 1311.1 reads, in pertinent part, as follows:

---

2. No claim was made for lost wages in this case.

*"Rule 1311.1 Procedure on appeal. Admission of documentary evidence*

"(a) The plaintiff may stipulate to $15,000 as the maximum amount of damages recoverable upon the trial of an appeal from the award of arbitrators. The stipulation shall be filed and served upon every other party at least 30 days from the date the appeal is first listed for trial.

"(b) If the plaintiff has filed and served a stipulation as provided in subdivision (a), any party may offer at trial the documents set forth in Rule 1305(b)(1). The documents offered shall be admitted if the party offering them has provided written notice to every other party of the intention to offer the documents at trial at least 20 days from the date the appeal is first listed for trial. The written notice shall be accompanied by a copy of each document to be offered.

"(c) A document which is received into evidence under subdivision (b) may be used for only those purposes which would be permissible if the person whose testimony is waived by this rule were present and testifying at the hearing. The court shall disregard any portion of a document so received that would be inadmissible if the person whose testimony is waived by this rule were testifying in person.

"(d) Any other party may subpoena the person whose testimony is waived by this rule to appear at or serve upon a party a notice to attend the trial and any adverse party may cross-examine the person as to the document as if the person were a witness for the party offering the document. The party issuing the subpoena shall pay the reasonable fees and costs of the person subpoenaed to testify, including a reasonable expert witness fee if applicable. . . ."

The rule, by its terms, is unequivocal: if a plaintiff files the required stipulation, and timely serves notice with copies of the documents to be offered, then the documents are to be admitted. The drafters of the rule perhaps did not envision a situation where the author of such documents would fail (or refuse) to testify if subpoenaed.

At first blush, Dr. Walinsky's refusal to testify appears to create significant prejudice to the defendant—the medical records allegedly created by Dr. Walinsky are admitted into evidence, but the defendant is unable to cross-examine him on their contents, or the circumstances under which they were created.[3] In reality, though, the defendant's objection is *not* to the authenticity of the records, but instead to their *accuracy* and their *truthfulness*.

The defendant did not contend that the records were created from whole cloth; rather, the defense contends that Dr. Walinsky's records were inherently untrustworthy because the doctor was—at the same time he was treating Mr. McGill—allegedly participating in a large-scale insurance billing fraud scheme. According to the defendant, it is unknown whether or not the veracity of his diagnoses and/or the accuracy of his treatment histories would have been affected by his alleged criminal activity, and for that reason, the defense argues, the records should have been excluded.

---

3. The apparent reason for Dr. Walinsky's refusal to testify is that, on August 20, 2004, the Commonwealth filed a 140-count criminal complaint against him, alleging numerous instances of falsified billing of insurance claims and related offenses, which are alleged to have occurred during the period of time when the plaintiff was under his care.

I believe, however, that the question of the veracity of Dr. Walinsky's records was adequately addressed in my instructions to the jury:

"Under our court rules, we are permitted to bring medical records in without bringing a doctor in and you have heard the diagnosis, which is the doctor's professional belief as to what he found when he examined the plaintiff, and the prognosis is, what is that doctor's outlook for that patient's future condition.

"The doctor was called to the witness stand to be cross-examined, which is an opportunity for the defense to question the doctor on the veracity and the accuracy of the information contained in the medical record. The doctor, for reasons of his own, chose to claim the protection of the Fifth Amendment, and refuse[d] to answer any questions. *You may take that into account in deciding whether or not to accept the report concerning the diagnosis and the prognosis into your consideration.*" (N.T., January 4, 2005, pp. 130-31.) (emphasis added)

It appears that the jury understood and followed my instructions; its $5,000 verdict seems eminently reasonable to compensate the plaintiff for the injuries that he described, his testimony, standing alone, was sufficient—if accepted as true—to support an award in that amount, and the jury was completely entitled to believe that testimony if it so chose.

My decision to allow Dr. Walinsky's records into evidence was thus correct, as was my decision to deny the defendant's motion for compulsory nonsuit. For the same reason, even if the admission of Dr. Mattingly's report was error, it was harmless error because the jury

award was amply supported by the plaintiff's own testimony.[4]

Finally, I believe that it was reasonable under the circumstances to impose a $350 expert witness fee on the defendant for having called Dr. Walinsky to testify.

According to counsel, Dr. Walinsky's "normal" witness fee at the time was $1,200. In light of the fact that he did not answer any questions substantively, and given that his testimony thus took only a very short time, a significant reduction from his normal fee was appropriate.

It is difficult to accept counsel's assertions[5] that Dr. Walinsky's testimony would have been confined exclusively to factual matters. Virtually any question concerning the plaintiff's treatment that began with the word "why" would have nudged Dr. Walinsky over the dividing line between fact witness and expert. In the absence of a witness fee, are the answers to those questions inadmissible? Is a court expected to monitor the questioning of such a witness, and to impose a witness fee only when that magical line is crossed?

Fundamentally, Dr. Walinsky's treatment records were admissible under Rule 1311.1 only because he *was* an expert. I therefore ruled that the defendant was liable for

---

4. Mr. McGill's testimony on recross-examination likely enhanced his credibility with the jury. In response to a question about his motivation to file this lawsuit, he said, "I drive a taxi. I have insurance. I have to pay for my insurance. Every time I claim an injury, my insurance increases. So I have no reason at all to lie about my injury." (N.T., January 4, 2005, p. 63.) I see no reason to disturb the jury's verdict here.

5. I do not mean to suggest that counsel was being mendacious, but only that her view of the likely scope of the proposed cross-examination was unrealistic.

payment of a witness fee, in an appropriately reduced amount, as the defense derived a significant tactical benefit from having Dr. Walinsky appear at trial and repeatedly take the Fifth Amendment in front of the jury.[6]

## CONCLUSION

In sum, I do not believe that any trial errors occurred in this matter. To the extent that my decision to allow Dr. Mattingly's report into evidence was erroneous, the error was harmless, as a good and sufficient basis existed to support the jury's award.

For the above reasons, I respectfully suggest that my decision in this matter be affirmed.

---

6. It should be noted at this point that the defendant did *not* have to pay Dr. Means an expert witness fee, because the parties waived her appearance, agreeing that she would have taken the Fifth Amendment in response to all questions, had she appeared. In any event, Rule 1311.1, by its terms, requires payment of a fee to an expert witness for *appearing,* not for *testifying.* The fact that Dr. Walinsky refused to testify substantively is irrelevant; his appearance alone triggers the obligation to pay an expert fee.